Here to you, here to you, this Honorable Appellate Court for the 2nd Judicial District is now in session. The Honorable Susan F. Hutchinson presiding. Please be seated. Your Honor, the first case of the morning is Suite-23-0009. Justice Chavez v. Appellate v. Village of Kirkland v. Honorable Appellate Court for the District of Cali. Ann Ann McCabe, the Judicial Defendant's Counsel, arguing on behalf of the Counsel to Ms. Allison Harrington. We are going on behalf of the Appellee to proceed with this hearing. Good morning and may it please the Court. My name is Allison Harrington. I represent the Village of Kirkland and Officer Andrew Holmes. This appeal arises from an entry of a directed verdict on the Village of Kirkland and Andrew Holmes' affirmative defense of discretionary immunity brought pursuant to 745 ILCS 10-2-109 and 2-201. The court, trial court, found as a matter of law that these defendants were not afforded discretionary immunity. Recently, or in relative recent terms, the Illinois Supreme Court has issued opinions directly addressing the issue of discretionary immunity in Monson v. the City of Danville and Andrews v. the Water Reclamation District of Greater Chicago in 2018 and 2019, respectively. In Monson, the court laid out a framework for how to determine whether discretionary immunity applied and how it would apply. That framework involved a two-fold test. That two-fold test is, one, that an employee held either a position involving determination of policy or a position involving the exercise of discretion. The second prong would be the employee engaged in both the determination of policy and the exercise of discretion when performing the act or mission from which plaintiff's injury resulted. What the Supreme Court said in Monson, though, is that each case has to be determined on a case-by-case basis. So the facts of each case is really what has to be evaluated, that there's no cookie-cutter application of the discretionary immunity defense. So the facts of this case in particular are really what drive whether the discretionary immunity would apply or not. And would that generally have come from the chief of police in his testimony? Did he? The facts. Well, the specific facts that you're looking at, or I'm just wondering if that was it or if you have others. Because he was pretty specific about, although, let's see, he testified he did not control the specifics of this particular class, but he certainly was, he authorized the class on behalf of Kirkland and he gave certain conditions that should be taken care of during the course of the class that Officer Holmes really didn't have any jurisdiction over, but the policy was set by the village. I would say the facts, Justice, would be that the chief of police wanted to conduct in-house training, taser training, and that as a result of the in-house wanting to do that, he himself could not do that. He needed to have somebody get that training. In order to do that, he had to assign somebody to go get that training. The chief of police himself could never provide that training because he was not capable and did not have the ability to get that training because he was not certified. Right. So he did assign and delegate that ability to go get that training to Officer Holmes, and Officer Holmes did go and obtain that training from the taser training course in Lake Zurich. Okay. So, Counsel, in what way did Officer Holmes determine policy? In other words, what was he doing to balance the competing interests on behalf of the municipality? And I would say, Justice Kennedy, that that is exactly, what he was doing is very similar to what occurred in the Heronet case. And the Heronet case is where there's a fire marshal that was conducting a fire drill. And in that case, the fire marshal was determining where, for instance, the participants in the fire drill would stand. In this circumstance, Officer Andrew Holmes dictated all of it. He dictated where, for instance, the actual training would take place. He dictated on what type of surface the training actually took place on. He made a conscious decision, which the Supreme Court in Monson is very, really is one of the driving forces in Monson, is this concept of a conscious decision. He made a conscious decision to proceed with the training in the fire department. Even though there was only company in the fire department, he made that conscious decision believing that it was safe to proceed in that way. But what are the interests that are being balanced here? The interests that are being balanced is safety, being able to efficiently run your training, to being able to, yes, safety and efficiently running your training, which is exactly what the Supreme Court indicated in Heronet. So for balance, so safety on the one hand, what's on the other hand? You're balancing the safety of the participants. And that's what in Heronet is what they were balancing is, okay, well, where am I going to put the safety? Okay, well, I'm going to put them here, and I believe that's going to be safe. That's if you're balancing the interests of the individuals that are participating in the fire drill. Okay, so in terms of a discretionary call, I can see the discretion in your argument is that the discretion was used in where to place people. What I was getting at is the policy, and usually there's some cost benefit or something, and you can see it in other settings. You know, a training setting seems to have less policy, quote, unquote, than like a school board policy determination. So in what way is the policy here a balancing between safety and is it cost? Well, that is the reason that the chief wanted to have in-house, the chief delegated to have in-house training in order to not have to send his officers out to. Right, and that's the chief's call. What about Holmes' call? What is his decision here that is a policy decision? His policy determination is from the standpoint of policy determination does not have to be simply a cost or safety or it's not limited in that way. I mean, the case law from Harrison versus Hardin, you have a principal that refused to allow a student to go home because of weather. And that policy determination was simply because it was a safety issue. So the policy determination was not to allow the student to go home because of a safety issue. And that was determined to be a policy determination. Can I ask you, where would you draw the line between policy and discretion? I mean, these decisions are being made on how the trainees should go forward, you know, all along. And you contend Holmes is making these decisions. Which would be policy? Or how do you make the distinction between what was his discretion and what was the setting of policy? Well, I guess we have to look at what the Supreme Court has defined as what is a policy determination. And then what the Supreme Court has defined as what is the exercise of discretion. It can satisfy both. And I keep on going back to the Harnik case because the Harnik case is analogous to this case. The fire marshal. Correct. And because in that case, the Supreme Court determined that where to place a student or where to place that participant in the fire drill was both a policy determination and a discretionary decision. So it's really, it's looking at what that definition of each of these terms are. And can it and does it apply? So, for instance, under discretionary acts, you have to look at is it unique to a particular public office. And then the second part of that is whether there's some personal deliberation involved. So, in this circumstance, I would argue, in this case, we have the incident occurs in the fire department. And because of what happens in the taser training, you have an individual who is essentially hooked up to the taser by alligator clips. And one is up on the shoulder and one is down by the waist. And you have two spotters on each arm. And when Officer Holmes, who's back here, activates the taser, because of neuromuscular incapacitation, he begins to fall forward. And in the process of falling forward, his shoulder comes into contact with his spotter on the right. And as he's approaching the ground, that pain stimulus to the spotter on the right ends up causing the spotter to drop him and he falls closer to the ground. One of the issues is the failure to use a map. Well, Officer Holmes made a conscious decision in planning this training to do this training at the fire department. He made a conscious decision to do this training at the fire department, knowing it had carpets similar to this in this courtroom. Knowing that he didn't have maps. So, he made a conscious decision to do this training with that type of carpeting. And he did it knowing he had to make a decision based upon the safety of the participants of his classroom. He also did that with personal deliberation when he's in the classroom and he is conducting this taser training and it results in the injury. So, we have both elements of a discretionary act and we have the determination of policy by him on this issue of the carpeting or the flooring, the type of flooring involved. Now, he was certified, Officer Holmes was certified, I believe, in a situation where they actually used maps. No. They did not. They did not. So, that's part of it and I think that goes to one of the issues that I know Plaintiff has brought up and why the argument that this would be ministerial versus discretionary in nature. Officer Holmes was trained in in-person training as an end user on concrete and then in his instructor class at Lake Zurich, it was on carpets similar to this. And the point being as to kind of jump into the idea of ministerial versus discretionary, the idea that we are now going to essentially give guidelines of a private corporation the effect of legal mandate because that's what ministerial is. If we look at the case law, we look at Snyder versus Curran and that is a fantastic example. You talk about, for me, it's my brain, it's the easiest example. You have the manual and uniform traffic control devices. That's something that's adopted by state statute. That's given the effect of legal mandate. That makes sense. In this circumstance, the argument to say that a private corporation, that their guidelines, that the expert in this case, one of them, Jerry Statton, granted, yes, he's our expert, but he was one of the original master instructors from TSER, tells you that these are guidelines that were drafted specifically for the limit of liability. And to say that we're now going to turn those guidelines into legal mandate does not make sense in light of the case law. In addition, when you have, in order to become a certified instructor, the guidelines don't make you a certified instructor. You have to go to the class. In the class that he was taught at, he was not taught in accordance with those guidelines. So how can you give legal mandate, essentially, the effect of legal mandate to a private corporation's guidelines when they're not even following them? Is there any other way that the training could be conducted by the TSER without some sort of guidelines to look at? I mean, they don't, how would they, if they didn't have those guidelines, what would they use, I guess is the point. Well, there's nothing wrong with having guidelines, Justice. I mean, I think that, but what they're asking is that they're being given the effect of legal mandate. It's, you know, I think any product's given instructions, right? And I think in any sort of training circumstance, people are given some sort of guidance in how to do it. But what they're asking is trying to turn in the private corporation's guidelines and giving them the same effect as something as significant as the manual and uniform traffic control devices, which is adopted by state statute. There's no evidence, and we know, in fact, that the TSER guidelines aren't adopted by the state, and we know that the village of Kirkland didn't adopt them by ordinance. They're not otherwise adopted in any other way. They're simply private corporation guidelines. There are no regulations that were identified during the course of the trial, administrative regulations, anything of that nature relating to this particular, well, I'm just calling it TSER because that's the TSER manual, the TSER guidelines. Correct. No, there was not. All right. And it didn't, did it actually say you had to have a mat or a mat was preferred? It did mandate a mat. The guideline indicates a mat should always be used. All right. And should is a critical term based upon a lot of law. Okay. And that would be our position in that regard. All right. Justice Kennedy. May I ask, what about the lack of a post-trial motion? In that regard, Your Honor, I will address this from the standpoint of they have cited to the CRIM case. And in my reading of the CRIM case, I believe the CRIM case actually supports our position. The CRIM case, you have a situation where the plaintiff, I believe, had a medical malpractice case, and there was an informed consent and a professional negligence case.  I believe the informed consent case was directed out. Ultimately, the Supreme Court allowed the appeal on the informed consent case because it never went to the jury and it was directed out. That is exactly what occurred here. This never went to the jury. It was directed out. This matter was brought on multiple occasions to the trial court. Two motions were dismissed, two motions for summary judgment, and then it was directed at trial. I believe under the case law, you aren't required to have to bring the issue for the fifth time to the trial court to address the discretionary issue immunity. And it is purely a legal issue, I believe, properly before the appellate court. All right. Justice Kennedy? No. All right. You'll have an opportunity for rebuttal, and we will proceed then to go on. Thank you. Thank you. Mr. Kronhauer. Thank you, Your Honor. May it please the Court, Counsel, Mr. Chavez. Good morning. My name is Douglas. I obviously represent Mr. Chavez. I apologize. I kind of lost my voice two weeks ago, and it's just coming back. So if you have trouble hearing me, please let me know. My game plan today was to kind of go through the lack of post-trial motion first and then talk about the immunity, because I think that's positive. But before I begin, I would like to offer, are there any pressing questions you want me to address right off the bat? Then I'll begin. I think 1202 is clear, and I think it's important for the Court to consider, you know, what's the role, what's the purpose of 1202, and that's to give the trial, you know, fairness to the trial court. Let the trial court, after the dust has settled, after, you know, the battle is over, to have the record, have the parties explain to them, okay, now that we have time, now that we're not in the heat of battle, Your Honor, you erred for X, Y, Z. And the trial court can then, without having the pressure of trial jury's time, go through the record with the attorneys and say, no, you know, there was error, there wasn't error. And Krim talks about this. Well, my problem with that is, as Ms. Harrison just finished up, this came up at least four different times before this end of the case. Correct. The judge had time to think then, probably thought about the case from time to time, even when he wasn't hearing it on a specific day. So it's not like he was rushed to this decision. But the difference is at this point in trial, there's actual evidence in trial. What you rule upon at motion dismiss is a different standard. Summary judgment is a different standard, different evidence. This is trial evidence now that you have to rule upon. So things have changed. But how do we distinguish Krim? Apologize, Justice. You know, if Krim is the case where there was a directed finding on informed consent, everything else went to the jury, no post-trial motion, gets reversed, goes back, there's a dust-up about what should we be able to retry. The Supreme Court said you can't retry all the issues that went to the jury, but the remand is on the informed consent count. So how is this case different? This case is different because, and Krim talks about this, the intertwinement, right? There is one claim that went to the jury. Immunity is a question that the judge has to decide before it goes to the jury, and Krim is clear. If it goes to the jury, you have to file the post-trial motion, and this went to the jury. But Krim's did go to the jury, and then, you know, as a whole, on the negligence counts, or I guess that would be one way to phrase it, on the alternative theories of negligence. But it didn't go on the informed consent. The Supreme Court sent it back for a new trial on informed consent, so it really sounds like it sounds to me like this case is on all fours, except that here it's the defendant and there is the plaintiff. In that, there is a directed verdict on immunity, which, you know, was going to be an issue at the trial, and, you know, for the reason, fact issue, motion to dismiss, summary judgment denied, and that issue was taken from the jury. They didn't bring a post-trial motion if the judge, assuming the judge was wrong, if the judge was wrong on immunity, then why can't they have a result altered? So they're asking for judgment. Correct, but 1202B explicitly lists judgment as having to be raised on post-trial motion. But to answer your question, and I think you need to look at this broader than just this case, right? So if there is a new exception created, which I would argue there is. Well, I mean, different than Krim, because we're all kind of stuck with Krim, aren't we? Yes, which says that it's taken from the jury, the issues, even if they're intertwined. Did this issue go to the jury? It can't go to the jury, but it's intertwined with the evidence that the jury considered, because it's a case-by-case basis. So, you know, in some states like Michigan, you can take an interlocutory appeal of an immunity finding. You know, you can't do that in Illinois. So if the municipalities can appeal without going through the J&OV process, could they then appeal a second after that ruling was entered? Say that last sentence. Could they have been waiting with their notice of appeal on December 14th, the court rules, could they then file a notice of appeal saying this is an immunity issue, it's not an issue for the jury, not going to the jury, therefore we appeal? I mean, the other thought is, say they do file a post-trial motion, they raise seven evidentiary issues, but don't raise immunity. Can they then appeal, say, well, we're going to throw immunity in now because we didn't feel like the trial court was going to listen to it just like they didn't listen to the other four times? And I think the answer to those questions are this is why a post-trial motion is necessary in a situation where it goes to the jury, right? And it's going to the jury because it sticks with a procedure that is fair to the trial court to review everything affecting the trial, affecting the verdict, and saying, you know, here's my opportunity to cure, address issues. So, you know, in the current situation, once directed verdict is entered, it's taken away from the jury, case is over, right? Not the entire case. Right, but the issue that's allowed to appeal is over. Right. In this case, it wasn't over because the jury ruled on the one count. You know, if they're in defense, it's not a count. They ruled on the negligence. They didn't hear the they didn't decide immunity. Well, the jury will never decide immunity because it's a question of law based on the facts of the case. So, again, it would set a standard of every immunity case. You could appeal it as of right regardless of what transpires next. And Krim talks about this. You know, there's no case law that states you can't give the trial court another shot to show him that he has an opportunity to fix what the error was. Krim talks about the intertwinement I've talked about. Krim talks about... In this case, there was intertwinement. But in Krim, there was not. And, therefore, that's why the Supreme Court didn't err. And you wouldn't ask us to overrule that because it was separate. Well, Krim's even stronger than that. Krim says even if it is intertwined, you still have to file the post-trial motion or 1202 for fairness to the trial court to give them the opportunity to review the record. So I think Krim's even stronger than your analysis, Justice. So, look, guide me through how this immunity is intertwined with the other. How do you put those together? Well, it's intertwined because, I mean, a lot of the evidence at trial went through who made the decisions, who did what when, you know, what were they supposed to do, what were they supposed to follow, which is a nice segue to the case law, right? And, you know, the one thing I don't think the briefs really talk about much is what conscious decision was made to shoot the spotter. There wasn't one. That was an inadvertent mistake. That's not a conscious decision. And when you look at the case... Well, that is a dispute that I believe that the two sides have. Was he shot or did he inadvertently get contact? And I know that's a decision that you two do not agree on, correct? Which, I think it's, I guess, how you phrase it. There's no dispute that the spotter was tased. Well, felt the effects of the taser, I think, is how Miss Harrington had talked about it in her brief. But you, in your brief, say that he was actually shot. And there would be a difference, wouldn't there, between this inadvertent brushing against the alligator claw or whatever was there and being directly shot? I mean, the instructor used a gun from afar, which goes back to the taser rules, these alligator clips. The taser will stay in there. You clip the taser to your back and to your legs to avoid this situation. Again, the case law, if you implement a plan, which they did in this case, taser, you have to do it in a non-negligent manner. And clearly, given the testimony, which goes back to discretion, it was done in a negligent manner and deviated from the taser guidelines. And this whole legal mandate... And the jury found it was negligent. But the issue is, and it's pretty much always the issue in these immunity cases, is there's negligence. So it's not, well, you're immune if you're not negligent. That's not the rule. That's not how we decide that, right? If you're immune, it doesn't matter unless there's willful, wanton behavior. I'm sorry, say that last sentence. If you're immune, there's no liability unless there's willful, wanton behavior. Correct. If you're not immune, then negligence applies. Right. But maybe I misunderstood you, and I apologize. I thought I heard you say, well, you know, nobody decided to shoot the spotter, and that's negligence. And I thought the implication was, therefore, there's no immunity. But apparently you're not saying that. Well, I apologize. How do you want to phrase it? The spotter was exposed to electricity. I don't think that's in dispute. The spotter was exposed. That was not a conscious decision to expose the spotter. It was inadvertent. It was unintended. So if there's no conscious decision, immunity can't apply. It's how the case law goes. In the Andrew case, no immunity because no conscious decision. Monson case, no immunity, no conscious decision. Over a sidewalk, tripping on a sidewalk. The Strauss case, if there's a road map, which Taser is, if there's a road map, no immunity. You know, they keep talking about the Harnik case, and the problem with Harnik case is, I mean, you kind of touched on it, Justice, he's a fire chief. The chief of police, if he wanted to, could have sent himself for this training and been the chief of police doing Taser training. He chose not to do that. If he chose to be the Taser trainer, maybe then we're in a Harnik situation where he can explain to us why he did different things. He didn't do that. He didn't want to. He made decisions, sent Holmes. Holmes had a report to the training officer, Sergeant Parker, who, despite what Ms. Harrington said, determined time, place, location, not Holmes, and said, here's the guidelines, we expect you to follow Taser, do it. And the legal mandate comes from the Illinois Municipal Code, where the village of Kirkland has the power to set up police departments. When it sets up police departments, it sets ordinances saying the chief of police, right, is at top, and officers respond to the chief of police by issuing orders, which is the Betz case. Didn't Lindstrom, the chief, require that participants be Tased? He required, so his testimony was Kingston officers had to be Tased, Genoa officers was up to Genoa chief, and Chavez was a Genoa officer. Okay. But they were still participants. Correct. Correct. And Officer Chavez, as I recall, said that he didn't want to do a lot of hand-to-hand combat from this point in his career, and so he wanted to learn how to properly use the Taser. So he fit the standard that Lindstrom had set. He wanted to learn, and if he's going to learn with Kirkland, he's going to be pursuant to Lindstrom's order, Tased. Correct? Correct. So, again, that's a dispute and a testimony that deteriorated to fair and out. Lindstrom said, Genoa officers do not have to be Tased. They're not my officers. I don't control them. He can't order other officers other than Kirkland. Well, then, if that's the case, why wasn't this a workman's comp case? He's a Genoa officer, and I know he is. He was. I'm not saying that that's an issue. Why wasn't then this workman's comp as opposed to this? This workman's comp would be against Genoa. This is a third-party claim against Kirkland. Okay, but it could have been a workman's comp. I mean, there was a workman's comp. Genoa let him go. Genoa allowed him to attend. I mean, there was a workman's comp claim made, but, you know, that's different from the third-party realm. No, I understand that, but, okay. Counsel, are you arguing that the distinction in Haranek and what they're saying is essentially Haranek stands for the proposition that the fire marshal, in saying stand here, is exercising discretion in implementing a policy? Why isn't this case analogous where Holmes is saying essentially you stand here? But this, I mean, he's a part-time officer who is directed to follow TASER guidelines, which he admitted on the stand. He's got no discretion to deviate. The chief admitted to that. In Haranek, it was the fire chief stating here's what you're going to do and here's the way you're going to do it, and that doesn't apply here. Holmes was just given the roadmap. Fire marshal, wasn't it? It was the fire marshal, yeah, sorry. I'm saying Haranek would apply, but the police chief was doing the class because now he is at the top of the food chain, and his decisions carry more weight because he's actually, you know, a walking policymaker to some extent, and that is not the case here where Holmes is three layers below the policy being made by Chief Lindstrom. And, you know, the defense expert testified that Holmes had no discretion to deviate from TASER. Lindstrom testified to that. Holmes even testified to that. So, you know, the policy was made at the Chief Lindstrom level, and once that policy was made, it had to be carried out in a non-negligent manner, you know, that the village and Holmes failed to do that. But they could both be exercising policy, I mean, at least in theory. But, Mike, what about the Richter case, which is the College of DuPage case where the sidewalks would heave? The grounds manager there, the court found, both the trial court and the appellate court, that the grounds manager set policy in that he determined what to do with particular heaves, with buckets of heaves, let's put it that way. Sure. It doesn't sound great on the recording, I'm sure. I know what you mean. But he also exercised discretion because he was going out to each heave and deciding, okay, am I just going to spray paint? Am I going to cone? Am I going to scrape? And if so, when? Sure. He was deciding what seasons. So there was sort of this, you know, granular level of somebody doing the work but making decisions, you know, both policy and discretionary along the way. And I guess my concern is that this teacher, now, you know, I know he's a part-time officer, you know, taser training officer, FTO, whatever, but bottom line is the contention is the argument that what he was going to teach, because there's always an infinite, you know, there's a vastness on every topic, what are you going to teach at this particular four-hour, eight-hour training, and then how to do it policy and discretion. What do you think? Sure. I'm happy to answer that. And the Richter case is different because the manager testified he had unfettered discretion. The buck stopped with him. He made the decisions, right? It is not this case. Does the discretion have to be unfettered? Does discretion have to be unfettered? That's what testimony in the Richter case was, have to be unfettered. Again, it's a case-by-case basis. In this situation, you know, kind of to segue to your next point about, well, this is a broad teaching subject, it's really not, if you look at Exhibit 5 with the guidelines, here's what you have to teach. You know, there's a PowerPoint. The more you look at anything, the more there is you could teach about it. There's always, you know, the time is going to limit what you can cover, the extent to which you can cover it. And so I think the issue then is, okay, you know, TASER has competitors, right? So there's other ways to teach this class, right? And we're not alleging you should have done one of the six TASER competitor programs or better. That's a policy decision. That's what they made. But in a situation where it's unique and it's covered explicitly by the guidelines, right, ordered by the chief of police, there is no discretion whether it's unfettered, whether it's minor, whether it's minute. You know, however you want to characterize discretion, there is no discretion in this situation with what happened and how it happened. I hope that answers your question. I believe my time is up. Yes, it was. If you would like to sum up. Thank you. I really appreciate it. You know, again, big picture of justices, you know, 1202B is clear. You have a post-trial motion. I think if you were to allow a firm or defense to be appealed regardless of post-trial motion, the next issue is can you interlocutory appeal it, can you appeal it in the middle of trial. Crim is clear. It's intertwined. If there's anything that goes to the jury, post-trial motion is required in that case for fundamental fairness to the trial court to correct, give an opportunity to cure. As far as discretion, Holmes' testimony is clear. Blenstrom's testimony is clear. The Chief's death testimony is clear. And there was no conscious decision to expose the spotter which caused the injury in this case. Thank you. Thank you. Ms. Harrison, I apologize by calling you by your last name without saying. I just was talking and not thinking clearly. Not a problem, Justice. Thank you. First off, I want to address this concept I think counsel is bringing up about the position and the comparison of the fire chief. So this idea that maybe the discretionary immunity would apply if the police chief was in charge of this training and not simply Officer Andrew Holmes. That is not what the Supreme Court says in Monson. The Supreme Court says in Monson that employee, okay, that we look at the plain language of the statute. And the plain language of the statute for discretionary immunity identifies public employee. That is defined under the Tort Immunity Act. And public employee can be anyone. It is up to the court to make a determination then whether that person in the position that they held were they actually engaging in determining policy. So you have to look at the facts. And it is not simply by a job title whether they did or they didn't. You look at the facts. And the facts in this case are not as crystal clear as counsel is suggesting. When you look at what they are saying that the police chief mandated, that it wasn't discretionary, that you had to follow the TASER guidelines. Well, the TASER training and the guidelines, you just can't take them in a vacuum. He went to a training. He went to an in-person training where at that training he was shown how to teach a course. At that training, he was tased and shown how to do exposures exactly on this type of floor that I'm standing on right now. And that is part of the reason they are saying he is liable for the injury. And then when we look at what Monson says, Monson says it is not just about the policy determination and the exercise of discretion. It's the act or omission for which the plaintiff's injury resulted. So you have to look at the specific things that occur with the actual injury. And so now they are talking about this concept that, well, there was no conscious decision to tase the spotter. The issues in this case are that Mr. Chavez was tased and as a result of being at voluntary exposure, he went down to the floor and hit his shoulder on a floor that didn't have a mat. And he was dropped because his shoulder came into contact, because that alligator clip came into contact with that spotter. All of this happens because of the direct contact, the direct activity in participation of Officer Andrew Holmes. This case is different in the sense of Monson and different than Andrew's. For Monson, you had a Director of Public Works who did an inspection a year before on a sidewalk project, right? In Andrew's, you had an engineer on a project who had a right under a contract to make a decision whether to use a two-ladder system or not and didn't. And I think didn't even know they had the option. In this case, we had an officer who was charged with conducting the actual training. He was charged with making the decisions on how to conduct the actual training. He was the person who physically connected the alligator clips to Mr. Chavez. He personally trained the spotters on how to hold Mr. Chavez and all the participants in the class, how to lower them to the ground. He was a direct participant from start to finish. That is why this case is like Harriman. The idea that simply because he didn't have a title, he's not entitled to discretionary immunity, I think is not what Monson is saying when they are describing their two-fold test. We look at the facts, and the facts of this case is Chief Lindstrom delegated the training of this to Officer Holmes. I know I'm out of time. I could go on forever, but I appreciate it. I'll ask my colleagues if they have questions. Justice Kennedy? I just have one question. Why not file the post-trial motion? Isn't that a decision that was made? Obviously, it could have avoided the whole motion here, but why not file that? Honestly, in hindsight, to avoid anything like this certainly would have been much easier to do that, Your Honor. Like I said, we had filed two motions to dismiss, two motions for summary judgment, had been told it was a question of fact, filed a directive verdict, and then on the eve of closing our case, plaintiff brings their directive verdict. After much argument, then it's advised that the court has determined it's a question of law, and then enters directive verdict. It's strictly a question of law. It's an issue of law that we have brought before that court on a number of occasions. Under the rule, it was our belief, and I believe the Crim case supports that, that you could take it directly to the appellate court. And it was the issue that we felt most strongly about in this case and wanted to bring to the appellate court as quickly as we could. And we did. I mean, we brought it, I think, within a couple of weeks versus waiting, you know, the 30 days to do, you know, going through all the other issues. We felt like this was the primary and strongest issue to have the appellate court address. You may summarize your position if you haven't already done so. Thank you. In sum, Justices, you know, I believe that Monson and Andrews has really highlighted for the appellate districts and underneath that what is required. And it's a case-by-case analysis based on the facts of the case. It is not a title. It is not a job title that earns somebody discretionary immunity. It is what is that person doing, what are the facts of the case. In this circumstance, this is a person who was delegated a position by their chief and was the only person in the whole village who could have provided this service to the officers in this village and for Genoa, for that matter. And under these circumstances, this case is different than Monson and Andrews because in this case, there were conscious decisions made throughout the entire process. And we would hope that the court sees, based upon their review of the record, that there is conscious decisions being made and that both the village and officer homes should be afforded discretionary immunity. Thank you. Thank you, counsel. And thank you to both of you this morning. We will take this matter under advisement. We will issue a decision in due course, and we are now going to take a recess to prepare for our next case.